I'm so glad that we are here today in the first judicial district, the first division of the first district. In the case of the people of the state of Illinois versus Teodoro Baez, 1-22-1816. My name is Terry Lavin, I'll be the presiding judge today along with my colleagues, Justice Aurelia Paczynski and Justice Cynthia Cobbs. And what we're looking for today is 20 minutes per side. The appellant should save some time for rebuttal. At the beginning of both of your arguments for a period of, let's say, five minutes or so, we'll try to not interrupt you. I'll let you get the main points out before we, you know, start badgering you. And we'll try to do it as professionally as possible and ask that you do the same. So let's go ahead and hear from the appellant. Thank you. May it please the court. My name is Deepa Punjabi. I represent the appellant Teodoro Baez. Mr. Baez appeals the summary dismissal of his as applied proportionate penalties challenge to his life sentence. This was originally a sentence of death that was later commuted to a life sentence. At Mr. Baez's sentencing hearing, one of his evaluating providers, Dr. Coleman, testified that Mr. Baez's condition could improve with time and age. And the issue that this appeal raises for this court is given that mentally ill people usually have diminished capacities that result in some reduced personal culpability. But at the same time, they nonetheless do sometimes have rehabilitative capacity if properly treated, especially when you have a younger offender like Mr. Baez. The question here is, does the proportionate penalties clause demand prior to the imposition of a life sentence that the sentencer account for that diminished culpability and enhanced rehabilitative potential, just as it does in the juvenile sentencing context, for example. And I think Mr. Baez has shown in this case, at least arguably, that in light of his youthfulness as a 23-year-old offender, in light of his severe but treatable mental illnesses and the evidence that he has attached to his petition showing his rehabilitative capacity, that he has made out at least an arguable claim that a mandatory life sentence is unconstitutional as applied to him in light of our evolving standards of decency. Mr. Baez relies on the underlying rationale of authorities such as Miller v. Alabama, people v. Leon Miller, Atkins v. Virginia, and people v. Clark to argue that certain types of offenders, such as juveniles and some emerging adults, and as Mr. Baez argues here, such as those with a treatable mental illness, that those types of offenders can have diminished culpability and yet have prospects for reform. In this case, Mr. Baez was a relatively young 23-year-old offender. He experienced the specific childhood adversities that have been recognized to have a stunting effect on one's development. He also had mental illnesses that his evaluating providers testified resulted in some diminished capacities that at least arguably lessened his personal culpability. However, unlike in the case with intellectual disabilities, for example, which are relatively static, Mr. Baez's condition with respect to his mental illnesses is not static. Dr. Coleman testified that his personality disorder could improve with time and with age, and it appears to have done so. When Mr. Baez was first incarcerated, he was engaging in conduct such as assaulting other inmates and correctional officers. But starting around 2012, he has maintained A-grade status for pretty much the entire decade, which means he has had good behavior and has not gotten into any trouble for many years. So Dr. Coleman testified his condition could improve with age. The documents he's attached to his petition at least arguably demonstrate that it has improved. And the same rationale that prohibits the application of a mandatory life sentence to a juvenile or the death penalty to an intellectually disabled offender, that same rationale arguably applies with equally persuasive force to a mandatory life sentence imposed on a relatively young, mentally ill offender, especially one like Mr. Baez, whose condition is not static and who has demonstrated some capability for reform, as his provider at the expert at the death penalty sentencing hearing testified he could. The sentencing court in this case never had the option to sentence Mr. Baez to anything less than a mandatory life sentence. Now, I know it imposed a sentence of death, but the only options before it were the death penalty or a sentence of mandatory natural life. So the question of Mr. Baez's rehabilitative capacity at his sentencing hearing really became moot. There was no sentence that the court could have imposed with any objective of returning Mr. Baez to useful citizenship because it wasn't even an option. And it's clear from the court's findings when it issued its sentence that it hadn't really even grappled with the question of Mr. Baez's rehabilitative capacity, because, again, what was the point given the sentencing options? And it's striking when you look at the court's findings when it issues its sentence, because the court makes very lengthy, very detailed findings. But nowhere in those pages and pages of findings does the court address the question of whether Mr. Baez has any rehabilitative capacity? Can his behavior improve if he receives treatment for his mental illnesses? Is he displaying any transient qualities of youthfulness or are his traits fixed? The court doesn't really get into any of that. The court does talk a little bit about his childhood adversities and his mental conditions and whether any of that reduced his culpability. But the court doesn't even once address the question of his rehabilitative capacity. And we don't know had the court I really think had the court been given the option to fashion a sentence that could account for his rehabilitative capacity. If the court might not actually have spent some time then considering those questions related to his rehabilitative capacity. But it's clear the court didn't really even consider that. But I think. Let me interrupt you and say that the court here, trial court, Judge Lampkin, imposed the death penalty after finding that there were, quote, no mitigating factors sufficient to preclude a death sentence. Doesn't that in and of itself indicate that there's an assessment with some discretion on the part of the trial court? It doesn't say mandatory. I think that the so that was the standard at the time to consider whether the death penalty should be imposed or not, whether there's mitigating factors sufficient to preclude the imposition of the death penalty. And the court did find that. There were things that reduced his culpability. The court did find that he was suffering under mental disturbances at the time of his offense. They just didn't find them extreme enough to preclude the imposition of the death penalty at that time. But, you know, again, I think the question of his rehabilitative capacity was so moot, given the sentencing options that the court just didn't really even grapple with that question. But given that mentally ill people usually have diminished capacities, reducing their culpability, but nonetheless do have rehabilitative capacity of properly treated. Some of them do. I think the proportionate penalties clause does demand that sentencing account for that diminished culpability and enhanced rehabilitative potential, just as it does in the juvenile sentencing context. And I think our standards of decency and sentencing fairness have evolved since then. You know, the sentence of death isn't even considered an acceptable sentencing option anymore. Illinois has abolished the death penalty. So these claims are to be evaluated under our evolving standards. And I think those standards have shifted. And I also think that the court, given the sentencing options, didn't really didn't even have an option to consider the question of his rehabilitative capacity. Just along. Oh, I'm sorry, Justice Kachinsky, go right ahead. Thank you. So this crime was in 1999. And in your brief, you mentioned that there was a 1990 psychiatric assessment that reported feelings of depression, attempted suicide, systemic disorder, needed intensive inpatient treatment. Additional reports stated defendant was blah, blah, blah, committed suicide, running away, psychotropic medication. Do you know if that was all available to the trial court? Yes, it was. Okay. And do you know if you ever actually received the treatment that was recommended in those reports prior to the crime? I just couldn't tell from the record. I don't think the record gives us a clear answer on that. I do think that those are the kinds of things that can be fleshed out at second stage. For example, with respect to his psychotic disorder unspecified, there was a diagnosis that Dr. Coleman made at the sentencing hearing of psychotic order unspecified. And that has become now more precise and concrete, and they've narrowed it down to a diagnosis of bipolar schizoaffective disorder. And at second stage, the counsel could bring out, you know, when was he medicated with what? At what point did we start to see a turnaround in his behavior? I think those are facts that should be further fleshed out at further proceedings. Now you're arguing that there's new information about his mental abilities, mental health at the time of the crime. We've got this information at the time of the hearing, at the time of the crime. There's reports before the crime. There's reports during the sentencing hearing. And now you're saying there is new information that was created while he was at an IDOC. Yes, Your Honor. But that information has already been considered, as I understand it, by the Supreme Court, and they didn't accept it as material. Is that a correct statement? The new information, if I'm understanding the timeline correctly, the new information came about, you really started to see a turnaround in his behavior starting around 2012, from what I can tell from what he's attached to his petition, which would have been after his direct appeal. But how would that apply to how he was at the time of the crime in 1999? I guess you've got new information about how he's behaving at the prison. Great. You know, 20 years later. But how does that relate back to 1999? So it relates to his sentencing in 2003. What was his rehabilitative potential at that time? At that sentencing hearing, Dr. Coleman said that his condition could improve with time and with age, and he has new evidence bringing that conclusion to light. Again, this was at the time of the sentencing. The trial judge didn't even have an option to consider his rehabilitative capacity. The options were death or mandatory life. But maybe we could analogize, it would be helpful to analogize to, for example, when we see in police torture cases where a defendant, you know, has a claim of physical coercion. And then years later, he can bring new evidence showing evidence supporting that original claim that if he has discovered evidence of a pattern or practice of physical abuse by an officer, he can then bring that claim, that new evidence of that claim. Similarly here, Dr. Coleman at the original sentencing hearing testified that he had rehabilitative potential and this new evidence he's bringing supports that. Isn't that, I don't buy your analogy because the example that you give of someone like later being able to prove a claim of torture is a lot more concrete than what you're talking about in terms of mental capacity. Now, I just want to go back and kind of touch on Justice Lavin's question a bit, because Justice Lampkin as a trial judge did consider mitigation. Otherwise, why was there any discussion about it? The mitigation was with respect to, I think, his personal culpability, but there was never any sentencing option that could have considered his rehabilitative capacity. I mean, I suppose, I guess the question for this court is whether mandatorily imposing a life sentence on a young mentally ill offender without giving the sentencing court even the option to consider whether there is potential for rehabilitation if properly treated, to not even have the option to consider whether something less than a life sentence is appropriate in light of that lessened culpability, in light of that potential for rehabilitation. Is a mandatory life sentence under those sentences at least arguably so cruel as to shock our moral senses in light of our evolving standards? And I would submit that it is at least arguably so. The rehabilitative capacity question at his sentencing hearing was a moot question, given the sentencing. Is there a difference between mental illness or being mentally ill and insane? Is there a difference? And if so, what is it? Well, I think legal insanity has a more specific definition. Mental illnesses and mental impairments, there are mental illnesses that can not rise to the level of legal insanity as I understand it. So even though he was declared to be sane, you're arguing now that over time, his behavior is such that we know that whatever his mental illnesses were, they were treatable. Well, Dr. Coleman certainly said that he could improve with time. We expect most defendants to improve over time, don't we? And we don't go back after they've improved after being in prison for 20 years and say, well, now that your behavior is better, we should re-sentence you in light of your better behavior. I'm not sure that we do consider that. We do sometimes because some sentences are not 100%. Some sentences allow for parole, but this was a life sentence without possibility of parole. So he will never, no matter how old he is, no matter how much better he gets, no matter how much treatment he gets, he will, under the current sentence, never be able to go to the parole board. And I think that that is sort of a problem because if the trial judge who was sentenced to death, her other alternative was life sentence without parole. So he has clearly no way to demonstrate that his mental health issues have improved and that he's no longer a threat to himself or to society. Now, he may not be able to prove it. The parole board may look at him, may look at the records, may do an investigation and say, no, you're not there yet. We don't know that. But I think the question is that he has, under these two options of sentencing, he has no opportunity for parole, which is a lot like other prisoners who can go back in time and say, look, I was sentenced to 25 years. And I kept saying, you know, I'm innocent. I didn't do this. The police beat this concussion out of me. And now we find out that there's a pattern in practice by these same police officers. And we do go back in time and say, oh, OK, you get a do over on your sentencing. So I can see where that is coming from. I'm not entirely sure I agree with it, but I can see where it's coming from. I don't think it's fair to say that we never go back on sentencing because we have done that. I think that's correct, Your Honor. And I think that the rationale of the juvenile sentencing context really applies here because we have the same thing. We have a mentally ill person that has diminished capacities that results in reduced culpability. But we have his sentencing or his evaluating provider at his sentencing hearing saying he can get better. And the court just never even had the option to fashion a sentence that could account for that. How do you account for his guilty plea? You have not. I don't see in this appeal that you're saying that his guilty plea was involuntary because of his diminished mental capacity. No, Your Honor. I'm not saying that it was involuntary, but because this was an open guilty plea with no agreement as to the sentence, it really is indistinguishable from a sentencing after after a trial or after after a guilty verdict. And I know that the state argues that under People v. Jones that his open guilty plea waived his sentencing challenge. Of course, in Jones, the Illinois Supreme Court held that a juvenile offender's fully negotiated guilty plea waived his Miller claim. But nothing in the language of Jones extended its holding to open guilty pleas where there is no agreement between the parties as to the defendant's sentence. And no, there's no allegation here that the plea was involuntary. I think we're freezing here. Did you freeze? Did I freeze? You froze. You're back. Go back two seconds. OK, good. I'm back. OK, I'm sorry. Sorry about that. OK, so I was just saying, though, that I know this court extended Jones with respect to the issue of his guilty plea. This court extended the Illinois Supreme Court's Jones decision to an open guilty plea in People v. White. However, as I noted in the brief brief, that holding is up for review currently in the Illinois Supreme Court. And since, you know, it's an open question, at least as to whether Jones applies to open guilty pleas with no sentencing agreement. It's at least arguable that Mr. Byers' sentencing plan was not waived by his open plea. Well, there's also the Asatuno case also. Yes, that holding, I think, is also up for review under White. It's the same hold. Right. Yeah, I think we can. Go ahead, Justice. Go ahead. I just like I think we can all agree that this was a heinous and brutal and particularly disturbing crime. That's not the question. So I know the state's coming up and they're going to start with it, but that's not an issue here. The issue is whether or not at the sentencing hearing, the judge had the option of considering any rehabilitative potential. And if she did, if she did, in fact, consider that. And if she didn't, if we think that that's reason enough to go back in time, given his apparent improvement in behavior and mental health status. Now, if I summarize it correctly, that's correct. I mean, the the. Attachments to his petition that are more recent are only illustrative of support that what Dr. Coleman said at his sentencing hearing was always true, that he did have rehabilitative capacity, that the court simply didn't have an option to account for and fashioning a sentence and that mentally ill people, particularly younger ones, are like juveniles in that they have reduced culpability, but nonetheless do sometimes have rehabilitative capacity and that the portion proportionate penalties clause demands that sentencing account for that. Thank you. If the death penalty had been unavailable from the beginning of the case, what would the permissible sentencing range have been? Well, I think because it was a double murder, it would have been mandatory natural life. Well, thinking and knowing are two different things. Where does it say that would be mandatory? You keep using the word mandatory here. And we've had cases where the mandatory add on 20 years for use of a gun, et cetera. But where does mandatory come up here? I know I cited in in my brief and I apologize because I don't have the exact citation in front of me. But I do believe there was a statutory provision that a murder of more than one person mandates natural life imprisonment. OK. Let's talk about the Miller issue. You know, you during your opening arguments here today, you on numerous occasions, young this young him, young Mr. Young guys, young 23. Show me another case in Illinois where Miller has been applied to somebody who's 23 on this. When the crime occurs. Well, I know there have been cases that have applied to 22 year olds that I cite in my brief. I believe it was. Keller and Savage. I also would point this court to Clark, the Illinois Supreme Court's decision in Clark, because this in Clark is Supreme. This was a similar challenge that was raised as in this case. And the Supreme Court explicitly said in Clark, we are not going to deny relief on this emerging adult claim because defendant was 24 years old. That's not what we're holding. They denied it because it was a discretionary sentence. And the experts in that case said that the defendant's condition could never improve, which is not what we have here. But they explicitly said we are declining to hold that a person in their early 20s can't bring an emerging adult claim. So they left it open. They didn't have to leave it open. They could have ruled on the basis of age, but they left it open. So it is still arguable. And at the first stage of post-conviction proceedings, I think that does suffice to constitute at least some arguable legal basis for Mr. Bias's age related claim. Now, the age and the mental illness, I think, are inextricable from each other. But but to the extent that he's relying on his age, I think that the whole age issue talks about brain development in the frontal lobe and impulse control. What this man said in his interview with police and what he said in sentencing was the exact opposite of impulse. This was somebody who was very, very violent, who was very, very well planned, who I don't know how many houses have a gun, a sword, a chainsaw and a handsaw, a hacksaw. I mean, this is like something out of Silence of the Lambs. This is not somebody who's having impulse control issues. Well, I think part of what Dr. Coleman talked about was his trying to find it, his intense anger, difficulty controlling anger, stress related paranoia. I think that certainly he showed planning in covering up his crime. But I think in the moment of his crime, the crime, the decision to kill. I think you could characterize as impulsive as there was a sudden and intense anger, which can be attributable to his mental illnesses, as testified to by Dr. Coleman. Grabbing the gun was the impulse and everything else is just planned. So grabbing the gun was the impulse and everything else after that just was a plan. The moment in which he had the decision to kill was I don't think was he came into that drug deal planning to kill anybody. So the reports from the other two doctors that were before the trial court, Dr. Rabin and Dr. Henry, and they write in their report, there is no evidence he is suffering symptoms of a mental disease or defect, which would have resulted in him lacking substantial capacity to appreciate the criminality of his conduct. What are we to do with those analyses? Just toss them aside? No, I mean, I mean, I think that's a piece of the puzzle and that's the fitness standard, which I think is different. Well, that's separate from the determination on fitness. Those are two separate issues in the record. OK, this comes out of a supplemental report that's included in the record that talks about his psychological status. There's also a letter or correspondence in there that speaks separately to his fitness to stand for trial. So there are two different issues. Sure. So I think that these are things that are should be parsed out at later proceedings, because we are at the preliminary stage and there's no question that there's some evidence in the record based on Dr. Coleman and Dr. Heinrich's testimony that he did have diminished capacities that are at least arguably lessened his culpability. There's also no question Dr. Coleman said that he could get better. So at least arguably. And I know that there might be conflicting things in the record between the experts, but I think that's best parsed out at later stages. Right now, this is a preliminary screening standard. And we're just seeing, is it even arguable? Is his claim even arguable? And based on the fact that you have Dr. Coleman and Heinrich stating that he has diminished capacities, which could reduce his culpability, at least arguably, and that Dr. Coleman stated that he could get better with time, which is an opinion as to his rehabilitative capacity. I think you do have an arguable claim here that justice and the juvenile sentencing context here, the court should have had the option to fashion a sentence that accounted for that reduced culpability and rehabilitative potential. I'd ask you to wrap up because it's already been about a half hour. Yeah. Were there any other questions that I could answer for the court? If not, then I would ask that Mr. Ask that this court reverse Mr. Baez's summary dismissal of his petition. OK, let's hear from the state. May it please the court. My name is Leslie Billings on behalf of the people of the state of Illinois. The people initially first argue that the defendant is precluded from bringing this age based claim before this court because defendant did not include this claim in his post conviction petition. In Williams, defendant had attached articles discussing brain development and maturity, but did not allege how the evolving science on juvenile maturity and brain development applied to his specific development. This was found to not be enough, even at the summary dismissal stage. Here, defendant not only failed to include support for his claim that he now presents on appeal, he did not present the claim itself in any form in his petition. Even Crockett, that defendant cites to counter Williams, dealt with a defendant who attached articles pertaining to brain development without including any factual supporting evidence regarding his own brain development. In that case, the court found that the articles were enough to state the gist of the claim. But in both of those cases, the defendant at least provided some information pertaining to brain development in his initial petition. Defendant in the current case failed to, in addition to failing to provide any factual support for his age based claim, did not even mention this claim in his petition, and so it is forfeited. The circuit court never had the opportunity to rule on the claim because defendant never presented it. Had there been enough in the petition to support such a claim, the trial court would have addressed it. Here, defendant has made no allegation that the trial court failed to address a claim in the original petition. Defendant argues that the omission of detailed facts from his petition should not defeat the claim. However, before this court even gets to whether or not facts exist to support the claim, it must at least be stated in the petition. Beyond defendant's failure to state his claim in his petition, he entered a voluntary guilty plea, which waived the right to challenge the constitutionality of his sentence per Jones. Jones stated that plea agreements, not just negotiated plea agreements, were contracts. And while the plea in Jones happened to be a negotiated guilty plea, Jones itself did not make the distinction between open guilty pleas and negotiated guilty pleas with regards to a waiver of all non-jurisdictional errors, including constitutional ones. Jones stated that fundamentally, plea agreements are contracts and principles of waiver apply equally to them. And entering into a contract is generally a bet on the future, which permits a defendant to gain a present benefit, does not say that it guarantees him to get one. Furthermore, in its decisions, Jones considered and applied the principles in both Dingell and Brady, both cases involving open guilty pleas. And because Jones' ruling focused on whether a plea was knowing and voluntary and not open or negotiated, neither Acetuna nor White extended the holding in Jones, as defendant argues, but rather merely applied it. Therefore, based on Jones, defendant has waived his right to challenge his sentence on the ground that he states. With regards to the type of sentence that defendant received, his sentence was not mandatory, where the court had the discretion to sentence him to a lesser sentence. The court imposed the death penalty only after hearing the facts of the case and was able to weigh the aggravating and mitigating factors. There was a minimum sentence, which was life. The consideration here is that the court determined his sentence after weighing the appropriate factors and had the ability to impose a lesser penalty. This sentence was supported by the Illinois Supreme Court, who also had the discretion to lower defendant sentence. Defendant claims that his sentence was mandatory because the court would have been required to sentence defendant to life if death had not been an option at the time. However, because the sentencing parameters are not the same as they were then, does not mean the court failed to exercise its discretion. This was not a sentence that was imposed without thought or consideration given to his circumstances and the plethora of mitigation that was presented, including his childhood, his upbringing, his drug use, the drug use that was prevalent in his family, and multiple psychological and psychiatric assessments. Jones included in its decision that a sentencing judge exercised its discretion when the sentence imposed was not compelled by statutory sentencing scheme. And in this case, it was not. The court's decision was compelled by her own belief that no mitigating factors existed to preclude the death penalty. Further, defendant status as a 23-year-old offender prevents him from mounting an as-applied proportionate penalties Miller-based claim and fails to demonstrate that he possessed the attributes of a juvenile. With regards to the cases that defendant cites, Crockett was 21 when he committed first-degree murder and armed robbery. This does not stand for the proposition that a 23-year-old is a youthful adolescent-like individual to whom this type of claim applies. Savage was also 21 years old, two years younger than defendant, and the court found that the trial court did not consider certain factors alleged in the petition, which is unlike the situation in the current case. In Clark, our Supreme Court affirmed the denial of a 24-year-old defendant's motion for leave to file a successive post-conviction petition for failure to satisfy the cause and prejudice test. Clark did not extend Miller protections to the 24-year-old defendant and declined to decide the issue. It is not arguable that defendant sentence violated the proportionate penalties clause where he was a 23-year-old offender and where the court already considered all of the factors presented here, such as his drug use, his upbringing, and his mental health history. And the facts contained in the record contradict his assertion that his brain functioned more as a juvenile than an adult. None of his individual facts and circumstances could be considered to have lowered his functional age where he contemplated the consequences of his actions in shooting Estrada. He created a detailed plan in carrying out and hiding evidence of the murders, including concealing their bodies. Finally, defendant claims that his life sentence does not take into account his lessened culpability due to his mental illness. Implicit in defendant's argument is the assumption that due to his mental illness, he had lessened culpability, stating that his claim shares the rationale as those advanced at Atkins. However, those who commit crimes who have a mental illness do not automatically have lessened personal culpability as those with intellectual disabilities, which the PC court pointed out in its decision. Atkins stated that intellectually disabled individuals do not act with the same level of culpability as other adults. In Clark, that court stated that it was a defendant's intellectual disability which lessened his personal culpability, although he did have mental illnesses with that. Every time that Clark mentioned lessened culpability, it was in relation to the intellectual disability of the individual, not merely someone with a mental illness. Regardless, the trial court took defendant's mental illness into consideration and declined to find that she should refrain from opposing the most severe sentence under the law. She did not find that it was mitigating enough in light of the crime that defendant committed. Later, the Illinois Supreme Court took defendant's mental illness into consideration when it stated that even if it found his mental illness mitigating, in light of the aggravating factors, death was the appropriate sentence. Certainly, if both courts found the death to be appropriate in this case, it cannot be said that defendant's commuted life sentence is too great a penalty to be imposed on him. Neither the trial court nor the Illinois Supreme Court found defendant's mental illness lessened his culpability. Defendant argues that his mental illness shares traits similar to someone with an intellectual disability, including intense anger, difficulty controlling anger, impulsive behavior, and that those traits could have caused him to snap when he killed Estrada, making him therefore less culpable. However, this theory was already rejected by the trial court and the Illinois Supreme Court, which stated that in looking at the facts of the case, the crime did not occur in a single isolated explosion of emotion, but rather a prolonged series of brutal acts and too slow and deliberate murders. Defendant's argument that his condition could improve over time is of no consequence, whereas mental illness was not found to be mitigating in the first place. Therefore, defendant's proportionate penalties claim does not contain an arguable basis in law or in fact, and should be rejected. For all of these reasons, and for the reasons stated in our brief, we would ask this court to affirm the decision of the lower court. Okay, any questions? I have none. I have none. Okay, we'll hear rebuttal. Thank you, Your Honor. Mr. Baez did not specifically make out an age-based claim in his pro se petition, as the state characterizes it. However, his petition did more broadly state that his life sentence violates the proportionate penalties clause of the Illinois Constitution because it does not account for his rehabilitative potential or try to restore him to useful citizenship. Now, at the first stage of proceedings, the burden on the pro se petitioner is extremely undemanding. He doesn't have to include all of the factual details supporting his claim. Here, he did cite his mental health, and although he does not cite to his age, given this particular facts of this case, this is a case where it is kind of impossible to consider one without the other. Because part of what made his mental illness treatable was his relatively young age. Dr. Coleman testified that with time and the aging process, his condition could improve. So the two factors are kind of inextricable. You can't really, under these unique facts, you can't really consider one without the other. And so here, you know, this court is required to read a pro se petition with a lenient eye and is supposed to consider the petition in light of the facts and the record. Here, it was abundantly evident from Mr. Baez's record that he was a relatively young offender with mental illnesses. And so the court can consider all of these things in the record that we learned from his detailed psychosocial history in deciding whether or not he can make out a proportionate penalties claim or not. Now, I've already addressed the open plea argument. This court extended Jones to an open guilty plea. But there has there has always been a longstanding distinction made in Illinois between negotiated guilty pleas, which do implicate contract and principles and a plea in which there is no agreement as to the sentence, which logically would not then implicate those same contract principles in quite the same way. But again, this holding is up for review in the Illinois Supreme Court. It's still an open question as to whether Jones applies to open guilty pleas. So it is at least arguable that his sentencing claim was not waived by the open plea. With respect to whether this was a discretionary sentence, the crucial point here is that the sentencing court, the options before it made the rehabilitative question completely moot. The court could have declined if they found reduced culpability, perhaps could have declined to impose death. But the rehabilitative question, I really think when you go back and look at the court's findings, it really does not even grapple with the rehabilitative question because there is no point given the sentencing options before it. And we really don't know had the court been had the option to fashion a sentence that could account for that rehabilitative capacity. If the court might not then have spent more time considering those questions and came out differently. But the court really didn't consider that. I'd ask you to wrap up if you could, please. Yes, Your Honor. Again, the question for this court is whether mandatorily imposing this kind of sentence on a young offender with potential for rehabilitation with lessened culpability due to his mental illness is a mandatory life sentence in those circumstances. At least arguably so cruel and disproportionate as to shock us in light of our evolving standards. And I would submit that it is at least arguably so. And for those reasons, I'd ask that you reverse the summary dismissal of Mr. Bias's post conviction petition. Any questions? None. Okay, we are going to take this matter under consideration and counsel. You both did a terrific job and you are credit to the bar to represent your clients. You know, feverishly as you did is something that's very impressive given the rather gritty and gory details that we have to deal with in this case. So thank you very much. We are adjourned and we will issue an opinion forthwith. Thank you. Thank you.